UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| TEAM KENNEDY,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>SHENNA BELLOWS, in her official capacity as the Maine Secretary of State,<br><br>　　　　　　Defendant. | Docket No. 1:24-cv-00052-JAW |

**SECRETARY OF STATE'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION**

Shenna Bellows, in her official capacity as the Maine Secretary of State (the "Secretary"), opposes Team Kennedy's (the "Campaign's") motion for a preliminary injunction.

**Memorandum of Law**

The Campaign, which seeks to elect Robert F. Kennedy, Jr., as President of the United States, wants to solicit people voting at next week's presidential primary to support Mr. Kennedy's campaign by signing his candidate petition. The problem is that Maine law squarely prohibits campaigns—or anyone else—from influencing voters at the polls regarding a candidate on the ballot that day. Seven presidential candidates not named Robert F. Kennedy, Jr., will be on the ballot on Mach 5, 2024. In the zero-sum world of political campaigns, an appeal to support one candidate necessarily suggests that the voter should not support other candidates for the same office. The Secretary thus provided guidance to municipal officials indicating that non-party presidential candidates like Mr. Kennedy should not be permitted to gather signatures at voting places at next week's primary.

1

The Campaign's response to that guidance is this lawsuit, which is long on rhetoric and *ad hominem* attacks but short on accurate facts and viable legal claims. The Campaign's Equal Protection claim is predicated entirely upon a fiction: that party presidential campaigns were given a chance to collect signatures at a statewide election, but the Secretary's guidance prevents Mr. Kennedy from receiving the same treatment. In fact, there are *two* statewide elections during the Campaign's signature-gathering window. Because presidential candidates are not on the ballot for the second of these—the June 11, 2024 state primary—the Campaign remains free to gather signatures at that election. Since party presidential candidates also had exactly one statewide election at which to gather signatures, the November 2023 referendum election, the Secretary's guidance results in exactly equal treatment between the two types of candidates. The Campaign's Equal Protection claim cannot survive these undisputed and indisputable facts.

The Campaign's two remaining legal claims are also meritless. The Campaign asserts that Maine's law requiring presidential electors to be registered voters is unconstitutional. That assertion directly conflicts with a 2020 Supreme Court decision in which Justice Kagan observed on behalf of eight Justices that "[a] State can require . . . that an elector live in the State or *qualify as a regular voter*." *Chiafalo v. Washington*, 140 S. Ct. 2316, 2324 (2020) (emphasis added). And the Campaign's final claim, which asks the Court to require the Secretary to conform her conduct to the Campaign's (incorrect) interpretation of Maine law, is squarely barred by sovereign immunity. As the Supreme Court has long held, the Eleventh Amendment does not permit federal courts to police state officials' compliance with state law.

Because all of the Campaign's claims lack merit, and because the other factors for injunctive relief favor the Secretary, the Court should deny the motion for preliminary injunction.

**Facts**

*Maine's Strict Prohibition on Influence at the Voting Place*

Maine's election laws, codified in Title 21-A of the Maine Revised Statutes, contain a broad prohibition on activities to influence voters at the polls on election day. That statute bars, within 250 feet of the entrance to the voting place as well as within the voting place itself, influencing or attempting to influence "another person's decision regarding a candidate for an office or question that is on the ballot for the election that day." 21-A M.R.S.A. § 682(2). Also prohibited is displaying advertising material, operating an advertising medium, displaying or distributing campaign literature, posters, palm cards, buttons, badges, or stickers containing a candidate's name or otherwise intending to influence the opinion of any voter regarding a candidate for office that is on the ballot for the election that day. *Id.* § 682(3). These activities are crimes if done knowingly. *Id.* § 682(5).

The law provides some exceptions to these sweeping prohibitions, but they are narrow. A candidate may greet voters "if the candidate or representative of the candidate does not state the name of the office that the candidate is seeking in that election year or wear any button, name tag, apparel or label or have or use any item or sign displaying the candidate's name or the name of the office the candidate is seeking or otherwise express support for or opposition to a party, a candidate or a ballot question." *Id.* § 682(2). Voters traveling to and from the voting place for the purpose of voting may have advertising material on their vehicle and may wear a campaign button not exceeding three inches in diameter. *Id.* § 682(3)(A). Municipalities, at their discretion, may allow "[n]onpolitical charitable activities and other nonpolitical advertising." *Id.* § 682(3)(B). Finally, a different statute provides that municipalities "may" designate a specific location at the voting place "where the collection of signatures may take place." *Id.* § 662(4).

The warden, an official appointed by the town clerk or as specified in a city charter, is responsible for enforcing § 682 at the polls on election day. *Id.* §§ 501; 682(2-A)(C). He or she has the express power to remove from the voting place any person in violation of § 682. *Id.*

*Signature-Gathering Requirements*

Maine's election laws require signature gathering for two main categories of political activity: placing referenda on the ballot, *see* Me. Const. art. IV, pt. 3, §§ 17–20, and placing candidates on the ballot. *See* 21-A M.R.S.A. §§ 335, 354. Candidates are generally required to collect a specific number of signatures from eligible Maine voters within a specific timeframe to obtain ballot access. For the 2024 general election, party presidential candidates wishing to appear on a presidential primary ballot were required to collect between 2,000 and 2,500 signatures from party members between October 1 and November 20, 2023. *Id.* §§ 335(5)(B-3) & 442. Non-party presidential candidates wishing to appear on the general election ballot must obtain between 4,000 and 5,000 signatures from any Maine voters between January 1 and July 25, 2024. *Id.* § 354(5)(A), (6), & 7(B). Party candidates other than presidential candidates must collect varying numbers of signatures (depending on the office) from party members between January 1 and March 15, 2024. *Id.* § 335(5), (6), & (8). And non-party candidates other than presidential candidates must collect varying numbers of signatures (depending on the office) from any Maine voters between January 1 and May 25, 2024. *Id.* § 354(5), (6), & 7(B).

During these signature-gathering windows, Maine has held or will hold three statewide elections. In November 2023, Maine held a statewide referendum election. Declaration of Julie Flynn, dated Feb. 29, 2024 ("Flynn Decl.") ¶ 17. On March 5, 2024, Maine will hold a presidential primary. *Id.* ¶ 5; *see* 21-A M.R.S.A. § 441. And, on June 11, 2024, Maine will hold its state primary for all other offices. *Id.* § 339. Major elections on the June 2024 primary ballot

4

include U.S. Senate and both of Maine's seats in the U.S. House of Representatives, as well as the entire Maine Legislature.  Flynn Decl. ¶ 16.

Comparing these election dates with the signature-gathering windows for the various types of candidates shows that each window corresponds with one statewide election, except for non-party presidential candidates like Mr. Kennedy, whose window encompasses two statewide elections.  Specifically, the November 2023 election was the only election within the signature-gathering window for party presidential candidates.  The March 2024 presidential primary election is the only election within the signature-gathering window for party and non-party candidates other than presidential candidates.  Non-party presidential candidates, whose petitions are not due until July 25, 2024, have a signature-gathering window that encompasses both the March presidential primary and June state primary.  *See* Flynn Decl. ¶ 17.

*Secretary of State Guidance Concerning § 682*

As a matter of longstanding custom and practice, municipal officials frequently seek guidance from the Elections Division of the Secretary of State on how to apply 21-A M.R.S. § 682 to circumstances with which they are or may be confronted.  *Id.* ¶ 7.  The Elections Division, in consultation with the Attorney General's Office, endeavors to provide such guidance.  *Id.*  In cases where many towns may face the same issue the Elections Division sometimes circulates a formal memo to all municipal clerks setting forth its guidance.  *Id.* ¶ 8.

That is what happened here.  Bangor's municipal clerk requested guidance from the Elections Division as to whether § 682 would bar the Campaign from gathering signatures at the March presidential primary election.  *Id.* ¶ 9.  Elections Division staff consulted with the Attorney General's Office and determined that signature gathering by a presidential candidate at the presidential primary would violate § 682.  *Id.* ¶ 12.  After the Secretary of State approved that

guidance, it was provided to Bangor on February 12, 2024, and incorporated into a memo on political activity at the voting place that was provided to all municipal clerks on February 23, 2024. *Id.* ¶ 14.

The memo, attached as Exhibit A to the Flynn Declaration, instructs that candidates for offices other than President may collect signatures and seek clean-election qualifying contributions at the March 5th election, provided that they do so after the voter has voted. *Id.*, Ex. A at 1. It further instructs that non-party Presidential candidate signature gathering is not allowed "because the candidate is running for the same office as the Presidential Primary candidates, resulting in influence on voters concerning candidates on the ballot that day." *Id.*

The rationale for the Election Division's guidance is that allowing a non-party candidate to gather signatures at an election in which there are candidates on the ballot seeking the same office creates prohibited voter influence under § 682. That rationale does not prohibit non-party campaigns from collecting signatures at elections where candidates for the same office are not on the ballot. Thus, as the Flynn Declaration expressly confirms, the Campaign will be permitted to gather signatures at Maine's June 11, 2024 state primary. *Id.* ¶ 15.

*The Novel Nature of the Question*

The complaint's portrayal of the Election Division's guidance as some sort of capricious and recent swing in policy is mistaken. Am. Compl. ¶¶ 35–38. As far as the longtime Deputy Secretary of State for Elections can determine, prior to the Election Division's consideration of Bangor's query, it had never considered how § 682 might apply to presidential candidates collecting signatures at the presidential primary. Flynn Decl. ¶ 10. The 2020 primary was the first presidential primary held in Maine since 2000. *Id.* Although the Elections Division issued a memo in 2020 instructing generally that candidates were permitted to collect signatures at the

presidential primary, it did not consider specifically the concerns under § 682 posed by *presidential* candidates gathering signatures at the presidential primary. *Id.* ¶ 11. It is perhaps unsurprising that the question did not arise in 2020, since Election Division records suggest that there were no non-party presidential candidates circulating petitions at the time of the 2020 presidential primary.[1] *Id.*

The Campaign's allegation that a 2020 Green Party presidential candidate was permitted to gather signatures at the 2020 presidential primary, Am. Compl. ¶ 4, cannot be correct. The Maine Green Independent Party was in 2020 (and remains) a qualified political party in Maine. Flynn Decl. ¶ 18. Its presidential candidate therefore could not have been gathering signatures as a non-party candidate at the time of the March 3, 2020 Presidential primary. *Id.*

It may be that the Complaint's allegation is referencing a non-party U.S. Senate candidate formerly affiliated with the Green Independent Party, who gathered substantial signatures at the 2020 presidential primary. *Id.* ¶ 19. The 2024 guidance would not have prevented this signature gathering, since U.S. Senate candidates are not on the ballot at the presidential primary.

## Argument

To establish that they are entitled to a preliminary injunction, the Campaign has the burden to establish that four factors weigh collectively in its favor: (1) the likelihood of success on the merits; (2) the potential for irreparable harm to the movant; (3) the balance of the hardships, and (4) the effect of the court's ruling on the public interest. *See Bruns v. Mayhew*, 931 F. Supp. 2d 260, 266 (D. Me. 2013). "The sine qua non of this four-part inquiry is

---

[1] Nor would this issue have arisen with other types of non-party candidates. Under state law, non-party candidates other than presidential candidates must complete signature gathering by May 25th, before the June primary, at which the offices they were seeking would be on the ballot. *Compare* 21-A M.R.S.A. § 339 *with* § 354(7)(B).

likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc., v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002). Here, all factors point toward denying any injunctive relief.

I. **The Campaign Has No Likelihood of Success**

    A. **The Campaign's Equal Protection Theory Cannot Succeed**

The Campaign's first theory is that the Secretary's guidance denies the Campaign equal protection under the laws by "invidiously discriminat[ing]" against non-party presidential candidates. Mem. at 8. Equal protection challenges to ballot access regulations are governed by a "sliding scale" analysis, in which the court weighs "'the character and magnitude of the asserted injury' to the complaining party's constitutional rights" against "the precise interests put forward by the State as justifications for the burden imposed." *Barr v. Galvin*, 626 F.3d 99, 109 (1st Cir. 2010) (quoting *Werme v. Merrill*, 84 F.3d 479, 483 (1st Cir. 1996)). Restrictions that "fall unequally on similarly situated candidates or parties" are subject to a heightened level of scrutiny. *Id.* "Reasonable, nondiscriminatory restrictions, however, need be justified only by legitimate regulatory interests." *Id.*[2]

The Campaign's Equal Protection argument is predicated entirely on attempting to characterize the Secretary's guidance as the sort of discriminatory regulation that requires heightened scrutiny. Specifically, the Campaign alleges that the Secretary's guidance bars non-party presidential candidates from collecting signatures at voting places (at the March

---

[2] It is less than clear that the manner by which the State provides opportunities for signature gathering at the polls is a "ballot access regulation" subject to the sliding scale test described above. The Secretary assumes that it is for purposes of these highly expedited preliminary proceedings but reserves the right to argue at a later time that rational-basis review should apply to the guidance.

8

presidential primary) after having allowing party presidential candidates to do so (at the November 2023 referendum election). Mem. at 9. The factual lynchpin of this theory of unequal treatment is the Campaign's allegation that "[t]he only election at which [the Campaign] is lawfully permitted to collect ballot access petition signatures from established registered voters is the March 5th primary election." Am. Compl. ¶ 34.

This allegation is dead wrong. There are *two* statewide elections that will take place during the Campaign's signature-gathering window. The Court need go no further than the Maine Revised Statutes to see that the Campaign's signatures are not due until July 25, 2024, while Maine's state primary will occur on June 11, 2024. *Compare* 21-A M.R.S.A. § 354(7)(B) *with* § 339. That election will have major races on the ballot, including statewide primary elections for U.S. Senate. Flynn Decl. ¶ 16. Moreover, Maine's new semi-open primary law—allowing unenrolled voters to vote in party primaries, *see* 21-A M.R.S. § 341—means that the Campaign will have access to the same broad cross-section of voters as the party presidential candidates had in the November 2023 election.

The Campaign will be permitted to gather signatures at the June primary. The Deputy Secretary of State has said so under oath. Flynn Decl. ¶ 15. The Election Division's guidance—which describes a policy of disallowing signature gathering when the same office is on the ballot that day while allowing other signature gathering—confirms this. *Id.*, Ex. A. Even the short email of the Bangor Clerk to the Campaign, attached as Exhibit B to the Amended Complaint, makes clear that the rationale for barring the Campaign from signature gathering was limited to the presidential primary.

Thus, far from creating unequal treatment, the Secretary's guidance has the effect of giving every candidate running for office in Maine in 2024 exactly the same treatment. Every

9

type of candidate gets one—and only one—opportunity to collect signatures at the polls. Party presidential candidates got to collect signatures at the November 2023 referendum election before turning in their signatures by November 20, 2023; non-party presidential candidates get to collect signatures at the June 2024 state primary election before turning in their signatures by July 25, 2024; and all other candidates, party and non-party, get to collect signatures at the March 2024 presidential primary before turning in their signatures by March 15 and May 25 respectively.

With the facts correctly understood, the Campaign's sole authority in support of its position, a 44-year-old district court decision from another circuit, becomes easily distinguishable. In that case, Florida required non-party presidential candidates to choose their running mates several months sooner than party presidential candidates and further barred substituting those running mates once selected. *Anderson v. Firestone*, 499 F. Supp. 1027, 1030 (N.D. Fla. 1980). Florida apparently proffered only generalized interests in ballot integrity to justify this special burden on non-party candidates. *Id.* The court found that this disparate treatment violated Equal Protection. *Id.* at 1031.

Here, there is no disparate treatment that would trigger the more searching review that seems to have been applied in *Anderson*. The Secretary's guidance gives each type of candidate one chance to gather signatures at the polls during their window for doing so. Every single candidate running in the 2024 general election thus will have "equality of opportunity" to gather signatures. *Barr*, 626 F.3d at 110.

Because the guidance does not in fact discriminate against non-party candidates, the State need only demonstrate that the guidance furthers "legitimate regulatory interests." *Id.* at 109. It does. Indeed, the guidance furthers not just legitimate, but vital governmental interests in

protecting voters from influence as they carry out their civic duty to vote.  The Supreme Court has recognized the strong state interest in providing voters at the polls with an "island of calm in which voters can peacefully contemplate their choices," free of solicitations, campaigns, and other attempts to influence them.  *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 15 (2018) (quoting State's brief); *see also Burson v. Freeman*, 504 U.S. 191, 207 (1992) (plurality opinion).

The Secretary's guidance furthers this interest by ensuring that presidential primary voters will not be approached by representatives of a candidate who is seeking the same office as the candidates on the ballot that day and is thus, by definition, an adversary of those candidates.[3]  The Campaign unwittingly highlights this adversity between Mr. Kennedy and the other candidates in its original complaint, referring to one candidate on the ballot next week as an "incompetent, desperate, senile President."  Compl. ¶ 1 (ECF No. 1).  Given the zero-sum nature of politics, even a purely positive appeal to voters that does not mention the other candidates on the ballot sends an unavoidable message that the voter should support Mr. Kennedy for president, and therefore not any of the candidates on the ballot that day.  Plus, the chances that every exchange between the Campaign and voters would eschew discussion of Mr. Kennedy's

---

[3]  The Campaign's hair-splitting argument that the "office" for which it is seeking signatures is that of presidential elector, not President, is at odds with the reality of presidential elections in Maine.  As the Non-Party Presidential Candidate Petition Form shows, the name at the top of the petition that the Campaign will be asking voters to sign is that of the presidential candidate, not his electors.  *See* https://www.maine.gov/sos/cec/elec/candidate/pdfs/2024%20Non-Party%20Presidential%20Petition.pdf.  What is more, in Maine, voters cast their ballots for presidential candidates, not electors.  *See* 21-A M.R.S.A. § 601.  It is only by operation of law that the voter's vote for a presidential candidate is transformed into a vote for the candidate's electors.  *Id.* § 801(1).  Moreover, the winning electors have no discretion; they are required to support the candidate that wins the popular vote.  *Id.* § 805(2).  Given these mechanics, the fact that the petitions are technically to appoint electors is irrelevant to the practical question of whether a signature-gathering operation for the benefit of a non-party presidential candidate will influence voters as to candidates on the ballot that day.

opponents seem slim to nonexistent. The State has a not just legitimate, but compelling interest in shielding voters at the polling place from such appeals.

The burden on the Campaign, in contrast, is negligible. As noted, it will still have the same opportunity to collect signatures at the polls as every other 2024 candidate. What is more, the Campaign, if anything, has a lesser overall burden to qualify for the general election ballot than a party presidential candidate. A party presidential candidate must collect at least 2,000 signatures from fellow party members within a period of less than 2 months. 21-A M.R.S.A. § 442. A non-party presidential candidate, in contrast, is granted more than three times as long—nearly 7 months—to collect 4,000 signatures. *Id.* § 354(6) & (7)(B). Moreover, those signatures can be from "any Maine voter," not just voters from a particular party. *Id.* § 354(2). Given these substantial advantages, the injury to the Campaign resulting from having one instead of two elections at which to gather signatures does not come close to outweighing the compelling state interest in protecting voters from influence at the polls.

### B. Maine's Registration Requirement for Electors Is Constitutional

The Campaign, in its amended complaint, adds a new claim that Maine's law requiring electors be registered Maine voters, *see* 21-A M.R.S.A. § 352, violates both the Electors Clause of the U.S. Constitution and the First Amendment. This claim fails as a matter of law.[4]

---

[4] The Campaign, despite arguing the issue in its preliminary injunction motion, has indicated to the Court that it does not see a need for the Court to address this issue at the preliminary injunction stage, on a theory that the Court could later issue relief permitting the campaign to substitute their current electors for unregistered ones. The problem with the deferred relief suggested by the Plaintiffs is that, were such relief granted, unknown numbers of voters would have already signed petitions containing an inaccurate list of elector candidates. While most voters may not care about the identities of the proposed electors given their ministerial function under state law, some might, and in any event the Legislature has deemed the information important enough to be printed on the face of the petition form. *See* 21-A M.R.S.A. § 354(1)(B). Thus, to ensure that as many voters as possible are presented with accurate information on the Campaign's petition forms, the Secretary urges the Court to consider the Campaign's likelihood of success on this issue now.

The Electors Clause states:

> Each state shall appoint, **in such manner as the Legislature thereof may direct**, a number of electors, equal to the whole number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or person holding an office of trust or profit under the United States, shall be appointed an elector.

U.S. Const. art. II, § 1, cl. 2 (emphasis added). The flaw in the Campaign's Electors Clause theory is apparent from the text itself: the appointment of electors is to be made "in such manner as the Legislature [of each state] may direct." Maine's Legislature has chosen to condition being an elector on registering to vote—thereby ensuring that the elector is part of Maine's political community and meets certain basic standards, specifically, being a U.S. citizen, Maine resident, and at least 18 years of age. *See* 21-A M.R.S.A. § 111 (setting forth eligibility requirements to vote). By so doing, Maine is determining the "manner" by which its electors are appointed to the Electoral College, just as the Electors Clause allows.

The Campaign's apparent position that the "manner" of appointing electors does not extend to establishing eligibility criteria is squarely foreclosed by the Supreme Court's recent decision in *Chiafalo v. Washington*, 140 S. Ct. 2316 (2020). There, the Court upheld a Washington law that imposed civil penalties on so-called "faithless electors"—electors who violate their pledge to vote for a particular presidential candidate. In recognizing the broad scope of the states' appointment power under the Electors Clause, the Court observed that "the power to appoint an elector (in any manner) includes power to condition his appointment—that is, to say what the elector must do for the appointment to take effect." *Id.* at 2324. Among the specific examples given by the Court of appropriate "conditions" that a state may impose on an elector are "that an elector live in the State or *qualify as a regular voter* during the relevant time

13

period." *Id.* (emphasis added). *Chiafalo* thus endorses as consistent with the Electors Clause the precise eligibility requirement that the Campaign claims to be unconstitutional.

Any argument that *Chiafalo*'s observation should be disregarded as dicta should be rejected. The Court's observation that states may impose conditions on electors, including requiring them to be registered voters, was not a stray observation, but an integral part of its reasoning for its holding that states can punish faithless electors. Moreover, it is impossible to distinguish the law upheld in *Chiafalo* from Maine's registration requirement. If states can condition becoming an elector on making an enforceable promise to vote for a particular candidate, states can necessarily also require them to meet far less intrusive conditions such as registering to vote.

The Campaign's appeal to *U.S. Term Limits*, *Inc. v. Thornton*, 514 U.S. 779 (1995), which held that states cannot impose qualifications on serving in Congress beyond those specified in the U.S. Constitution, falls flat in light of *Chiafalo*'s more recent and more on-point holding. Moreover, the holding in *U.S. Term Limits* is based on a close read of constitutional provisions and Founding-era history relating specifically to the election of members of Congress. *See id.* at 798–831. Its reasoning cannot be exported to the Electors Clause.

Indeed, there is a big difference between the constitutional provisions setting forth qualifications for Congress and the Electors Clause. Not only does the Electors Clause specifically delegate power to the states to decide the manner of choosing electors, but it includes no affirmative "qualifications" at all. The provision that the Campaign describes as a "qualification" is actually a conflict-of-interest provision stating that the elector cannot simultaneously hold certain other offices. That is a far cry from the Constitution's comprehensive requirements for serving in the House of Representatives, for example, which

affirmatively address age, citizenship, and residency.  *See* U.S. Const. art. I, § 2, cl. 2.  Under the Campaign's theory, Mr. Kennedy would have the right to choose a foreign national or a 5-year-old to be one of his electors.  That could not possibly square with the Framers' intent.

The Campaign's backup theory that the registration requirement violates the First Amendment rights of Mr. Kennedy's unidentified potential elector, who may not want to register to vote, fares no better.[5]  First, if it is permissible for a state to instruct an elector how to vote, as *Chiafalo* teaches, it cannot violate the Constitution to simply require that same elector to be a registered voter.  The former is a far greater intrusion on expressive conduct than the latter.

Second, the Campaign cannot rely on *Buckley v. American Constitutional Law Foundation*, *Inc.*, 525 U.S. 182 (1999), for the proposition that the voter registration requirement violates the free-speech rights of electors.  *See* Mem. at 12.  *Buckley* concerned the rights of ordinary citizens to engage in political speech in the context of circulating referendum petitions.  525 U.S. at 194–95.  Here, in contrast, the issue is not the rights of ordinary citizens but the criteria under which a person may be appointed to an office of considerable public trust in which they are responsible for carrying out the will of hundreds of thousands of Maine voters at the Electoral College.  What is more, the act the elector is entrusted to perform is literally the act of voting for a candidate for office.  Requiring such a person to be a registered voter could violate

---

[5] Indeed, it is doubtful that the Campaign has alleged facts sufficient to show standing to raise this claim.  The only factual allegation concerning this claim is that the Campaign "is blocked from selected [sic] a loyal supporter in Maine [as an Elector]."  Am. Compl. ¶ 55.  The wording of the allegation makes it unclear if the Campaign even has a particular supporter in mind or, rather, just wishes to have the option to choose a non-voter as an Elector.  Nor does it make clear whether this supporter, if he or she exists, has a principled objection to registering to vote or simply has not bothered to do so.  In any event, the obvious legal flaws of the claim makes it unnecessary for the Court to consider the standing question in this highly expedited preliminary proceeding.

the First Amendment no more than could requiring citizens to register to vote in order to cast a ballot at a popular election.

Finally, even if the registration requirement could be subjected to a standard First Amendment analysis, in which the governmental interests are balanced against burden on candidates or voters, a registration requirement would easily pass muster. Given the grave responsibilities of the office of elector,[6] Maine has a compelling interest in ensuring that electors are part of its political community and, further, meet certain basic standards, such as being a U.S. citizen and at least 18 years old. In stark contrast, the Campaign has a pool of hundreds of thousands of registered Maine voters from which it can select electors. Any infringement on its free speech or associational rights caused by the Maine law is negligible.

### C. Sovereign Immunity Bars this Court from Considering Whether the Secretary's Guidance Correctly Interprets Maine's Anti-Influence Statute

Count 3 of the Amended Complaint seeks injunctive relief against the Secretary on a theory that the Elections Division guidance memo misapplies the anti-influence provisions in 21-A M.R.S. § 682. This claim is squarely barred by sovereign immunity.

The Eleventh Amendment to the United States Constitution prohibits citizens from suing a state in federal court unless either the state has expressly consented to such suit or Congress has explicitly and constitutionally abrogated the state's immunity. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54–58 (1996). Maine scrupulously guards its Eleventh Amendment sovereign immunity rights. *See* 14 M.R.S.A. § 8118 ("Nothing in this chapter or any other provision of state law shall be construed to waive the rights and protections of the State under the

---

[6] To be sure, electors' responsibilities are ministerial under Maine law, but the facts in *Chiafalo*—involving Electors breaking their pledges to support their chosen candidates—demonstrate how bad actors in the Electoral College could attempt to sow chaos or alter the outcome of the presidential election.

Eleventh Amendment of the United States Constitution, except where such waiver is explicitly stated by law . . . ."). The State has relinquished its sovereign immunity only for a narrow band of claims. *See, e.g.,* 14 M.R.S.A. §§ 8103, 8104-A & 8104-B. None apply here.

The Campaign's claims against the Secretary are presumably brought under the narrow exception to sovereign immunity recognized in *Ex parte Young*, 209 U.S. 123 (1908). Under that doctrine, when "prospective relief is sought against individual state officers in a federal forum based on a federal right, the Eleventh Amendment, in most cases, is not a bar." *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 276–77 (1997) (emphasis added). The key requirement, however, is that the right at stake must be a "federal" right. The *Ex parte Young* doctrine does not extend to federal actions to vindicate alleged state-law rights, such as any rights that may be implicit in 21-A M.R.S. § 682.

The Supreme Court made this limitation to *Ex parte Young* explicit in *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89 (1984). There, a class of plaintiffs sought an injunction requiring administrators of an institution to conform their conduct to, among other laws, a Pennsylvania law governing the treatment of individuals with developmental disabilities. *Id.* at 92. In concluding that such an injunction was barred by sovereign immunity, the Court observed that "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment." *Id.* at 106. *Pennhurst* further recognized that this principle extends to bar "state-law claims brought into federal court under pendent jurisdiction." *Id.* at 121.

The *Pennhurst* rule remains alive and well. In a 2022 decision, the First Circuit, citing *Pennhurst*, cautioned plaintiffs challenging Maine's court e-filing rules that they "may obtain

17

relief only if they establish that the court officials violate the First Amendment, not merely state law, in delaying their access to complaints." *Courthouse News Serv. v. Quinlan*, 32 F.4th 15, 22 (1st Cir. 2022); *see also Lopez v. Massachusetts,* 588 F.3d 69, 73 n.1 (1st Cir. 2009) (applying *Pennhurst* rule). This Court has also recently dismissed claims under the *Pennhurst* rule. *See United Cannabis Patients & Caregivers of Maine v. Maine Dep't of Admin. & Fin. Servs.*, 535 F. Supp. 3d 46, 56 (D. Me. 2021) (Torresen, J.).

Count 3 of the Complaint, which is labeled a "Pendent State Law Claim," asks the Court to order the Secretary, a state official, to conform her conduct to the Campaign's (erroneous) interpretation of state law. Such relief is exactly what *Pennhurst* forbids. Count Three is thus barred by sovereign immunity.

Even if Count 3 were not barred, it would fail. Maine's Law Court has recognized that the Secretary's interpretation of election laws is entitled to judicial deference. *Melanson v. Sec'y of State*, 2004 ME 127, ¶ 15, 861 A.2d 641. This statute at issue here broadly prohibits activities to influence voters concerning candidates or issues on the ballot that day. The statute's narrow exceptions—allowing, for example, candidates on the ballot that year to greet voters only if they do not disclose the office they are seeking—only underscores the statute's otherwise broad reach. The Secretary's interpretation of § 682 as barring candidates running for an office that is on the ballot that day from gathering signatures creates an easy-to-administer rule for local officials while recognizing the zero-sum nature of political campaigns—if you are asking a voter to support you, you are necessarily implying that they should not support other candidates seeking the same office. Such an interpretation is, at the very least, reasonable, and therefore entitled to deference.

## II. The Campaign Has Not Shown It Will Suffer Irreparable Injury

The only way the Campaign could suffer injury as a result of the Secretary's guidance is if the guidance would cause it to miss the 4,000-signature threshold and thereby fail to qualify for the ballot. The Campaign does not submit any evidence suggesting that it is likely to miss the signature threshold when it submits signatures in July unless it can gather signatures at polling places in March. And, even if the Campaign is short of signatures come July 25th, the injury would not be "irreparable"; as it has in other cases, the Court could grant extra time to gather signatures in the unlikely event it is persuaded of a constitutional violation. *See Libertarian Party of Maine, Inc. v. Dunlap*, No. 2:16-CV-00002-JAW, 2016 WL 3039715, at *14 (D. Me. May 27, 2016).

Moreover, because there will be a second statewide election in June at which the Campaign will be permitted to gather signatures, its various protestations about the efficiencies of signature gathering at a polling place ring hollow. The campaign will be able to fully take advantage of those efficiencies if it gathers signatures at the June election.

Finally, the Court should reject the Campaign's effort to dragoon the more forgiving First Amendment standard for irreparable harm. *See* Mem. at 13. There is no First Amendment claim here. The Campaign is not alleging that the Secretary is violating an alleged right to speak to voters at the polls, it is alleging that she is not giving the Campaign an equal opportunity to qualify Mr. Kennedy for the ballot. A failure to qualify for the ballot is thus the only prospective injury that matters.

## III. The Public Interest Strongly Disfavors an Injunction

The final preliminary injunction factors, balance of hardships and consideration of the public interest, merge when the government is the party opposing a preliminary injunction. *See*

19

*Nken v. Holder*, 556 U.S. 418, 435 (2009). Those factors strongly favor the Secretary. The public's interest in attending the polls on election day is in voting for the candidates and issues of their choice. It is not in being solicited to support candidates, sign petitions, or otherwise be subjected to political messages, particularly where those messages are directly relevant to the choices on the ballot that day. To be sure, Maine law allows some—though certainly not all—of those activities to occur at polling places in limited ways at the discretion of local officials. But this reflects a legislative compromise between the interests of the public in not being solicited or influenced when they go to vote and the private interests of candidates, referendum advocates, non-profit organizations, and others. Thus, while allowing the Campaign to solicit voters at the polls next week may further the Campaign's narrow, private interest in placing its candidate on the ballot, it does not further any public interest.

## Conclusion

For the reasons stated above, the Court should conclude that the Campaign has failed to meet its burden to demonstrate that it is entitled to preliminary injunction.

Dated: February 29, 2024

AARON M. FREY
Attorney General

/s/ Jonathan R. Bolton
Jonathan R. Bolton
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
Tel. (207) 626-8800
jonathan.bolton@maine.gov