UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

TEAM KENNEDY,                    )
                                 )
            Plaintiff,           )
                                 )
      v.                         )          No. 2:24-cv-00052-JAW
                                 )
SHENNA BELLOWS, in her official  )
capacity as the Maine Secretary of )
State,                           )
                                 )
            Defendant.           )

## ORDER ON MOTION FOR PRELIMINARY INJUNCTION

The campaign committee of an announced independent candidate for President of the United States moves to preliminarily enjoin the Maine Secretary of State from enforcing a ban on independent and third-party presidential candidates collecting ballot access petition signatures for their slates of presidential electors inside polling locations during the March 5, 2024 presidential primary election, and from enforcing Maine's voter registration requirement for presidential electors. The campaign contends the Secretary is interpretating Maine's statute prohibiting political activities on election day, 21-A M.R.S. § 682, incorrectly and is applying the statute unequally in violation of the Equal Protection Clause of the United States Constitution. The campaign also contends Maine's statutory provision outlining the qualifications for presidential electors, 21-A M.R.S. § 352, both contravenes the Electors Clause and violates the First Amendment to the United States Constitution. The Court denies the injunction because it concludes the campaign committee is

unlikely to succeed on the merits of its pendent state law and equal protection claims, and the Court defers ruling on the presidential electors qualification controversy.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Maine election law prohibits certain activities on election day near or inside a voting place.  21-A M.R.S. § 682.  These limitations range from not being allowed to "instruct another in the method of marking the ballot" other than a narrow exception,[1] 21-A M.R.S. § 682(1), to not being allowed to "influence" or "attempt to influence another person's decision regarding a candidate for an office or question that is on the ballot for the election day" "within 250 feet of the entrance to the voting place as well as within the voting place,"  21-A M.R.S. § 682(2), to not being allowed to advertise in certain ways, such as displaying or distributing campaign literature, posters, or buttons "within 250 feet of the entrance to either the voting place or the building in which the registrar's office is located."  21-A M.R.S. § 682(3).

Maine election law also requires a potential candidate hoping to be placed on a ballot to gather signatures.  21-A M.R.S. §§ 335, 354.  The requirements differ whether the potential candidate is a member of a party and what level of office they seek.  For example, for the 2024 presidential election, party presidential candidates wishing to appear on a presidential primary ballot were required to collect between 2,000 and 2,500 signatures from party members between October 1, 2023 and November 20, 2023, *id.* §§ 335(5)(B-3), 442, while non-party presidential candidates wishing to appear on the general election ballot must obtain between 4,000 and 5,000

---

[1]       For example, the statute allows a voter who is unable to read or mark the ballot due to physical disability, illiteracy, or religious faith to request another person's assistance.  21-A M.R.S. § 672.

signatures from registered Maine voters between January 1, 2024 and July 25, 2024. *Id.* § 354(5)(A), (6), & 7(B). Party candidates not seeking to become President, have between January 1, 2024 and March 15, 2024 to gather the number of signatures required for their office, *id.* § 335(5)-(6), (8), while non-party candidates not seeking to become President have between January 1, 2024 and May 25, 2024 to collect the signatures required for their office. *Id.* § 354(5)-(6), (B).

Maine election law also sets out qualifications for presidential electors and county offices. 21-A M.R.S. § 352. The relevant provision requires that "[a] candidate for the office of presidential elector or any county office [] be a resident of and a voter in the electoral division the candidate seeks to represent on the date established for filing nomination petitions in the year the candidate seeks election." *Id.* The provision also requires that "[t]he elected official [] maintain a voting residence in that electoral division during the elected official's term of office." *Id.*

Maine has historically permitted prospective candidates to collect petition signatures inside polling locations, on tables provided by the State, as a matter of course[2] during both the primary and general elections.[3] *First Am. Compl.* ¶ 3 (ECF No. 8).

---

[2] The Deputy Secretary of State for the State of Maine Julie Flynn declared under oath that "[t]he only tables that the Secretary of State's office provides to municipalities for use at the voting place are for use by persons with disabilities wishing to use the ExpressVote universal voting system, an accessible ballot-marking technology that our Office provides to municipalities." *Secretary of State's Opp'n to Mot. for Prelim. Inj.*, Attach. 1, *Decl. of Julie Flynn, Dep. Secretary of State* ¶ 20 (ECF No. 16) (*Flynn Decl.*). She further declared she was "not aware of any use of those tables for signature gathering at the November 2023 election." *Id.* The Court treats Ms. Flynn's statement as a qualification and admits the fact.

[3] A word on the record. Team Kennedy filed its complaint on February 21, 2024, *Compl.* (ECF No. 1), and an amended complaint on February 27, 2024. *Am. Compl.* (ECF No. 8). The Court held a telephone conference of counsel on February 27, 2024. At the conference of counsel, the Court observed

During the November 2023 general election, Shenna Bellows, the Maine Secretary of State, permitted candidates seeking the Republican and Democratic party presidential nominations—Dean Phillips, Doug Burgum, Vivek Ramaswamy, and Ryan Binkley—to collect signatures on their ballot access petitions inside polling locations on tables provided by the State in order to secure ballot access for Maine's March 5, 2024 primary election.  *Id.* ¶ 2, 35.

Robert F. Kennedy, Jr., an announced independent candidate, also seeks to be elected the 47th President of the United States during the 2024 general election.  *Id.* ¶¶ 22, 25-26.  Team Kennedy, a registered campaign committee with the Federal Elections Commission, is the principal campaign committee to win the 270 electoral college votes required to elect Mr. Kennedy.  *Id.* ¶¶ 22, 26.  Unlike those seeking the Republican and Democratic party presidential nominations, Mr. Kennedy and his campaign were not permitted to collect petition signatures inside polling locations at tables supplied by the State during the November 2023 general election.  *Id.* ¶ 33.

For Mr. Kennedy to place his slate of presidential electors on the Maine general election ballot for the 2024 general election, Team Kennedy must collect 4,000 valid petition signatures from registered voters on Maine's Non-Party Nomination Petition, out of a maximum number of 5,000 raw signatures permitted to be filed with

---

that as neither the complaint nor amended complaint was verified, there was no evidentiary record for the Court to act on.  Plaintiff's counsel said he would file affidavits supporting the allegations in the Amended Complaint.  On February 28, 2024, Plaintiff's counsel filed four affidavits.  *First Decl. of David Stuart Owen* (ECF No. 12); *First Decl. of Laura Morris* (ECF No. 13); *First Decl. of Dianne Wilkins* (ECF No. 14); *First Decl. of Will Boothby* (ECF No. 15).  The Court compared the allegations in the Amended Complaint with the allegations in the four filed affidavits.  Although almost all the allegations in the Amended Complaint are supported by the affidavits, some allegations are not, and the Court considered only those factual allegations that are.  For ease of citation, the Court has cited paragraphs from the Amended Complaint, rather than the affidavits.

the town clerks for validation, and must file these signatures and other required documents, no later than August 1, 2024. *Id.* ¶¶ 22, 27-30, 32. Team Kennedy's Non-Party Nomination Petition is for the nomination of Mr. Kennedy's slate of presidential electors, not for an office or candidates for an office on the March 5, 2024 primary election ballot.[4] *Id.* ¶¶ 13, 45-46, 49. Mr. Kennedy must file all documents to secure ballot access for the 2024 general election with Secretary Bellows, the principal election official for the state of Maine. *Id.* ¶ 23.

Prior to February 12, 2024, town clerks instructed Team Kennedy campaign staff and organizers that they would be permitted to collect petition signatures for Mr. Kennedy's ballot access petition inside polling locations on tables provided by the State during the March 5, 2024 primary election because (as is always the case with candidates seeking the collection of ballot access petitions)[5] the candidate was not on the primary election ballot. *Id.* ¶¶ 5, 36-37; *Secretary of State's Opp'n to Mot. for Prelim. Inj.*, Attach. 2, *Ex. A to Decl. of Julie Flynn- Memo to Clerks* (ECF No. 16).

On or about February 12, 2024, the Secretary of State suddenly[6] informed the town clerks via email that they were not to allow those with presidential nomination

---

[4]     The Court recited this allegation because it is technically correct. The significance of the distinction between nominating presidential electors and nominating candidates for office is a point of controversy.

[5]     Please refer to footnote 2.

[6]     Deputy Secretary Flynn declared that "On February 12, 2024, the Elections Division received a query from Lisa, Goodwin, the municipal clerk for Bangor, asking whether § 682 permitted a non-party presidential candidate to gather signatures for his candidacy at the March 5, 2024 presidential primary." *Flynn Decl.* ¶ 9. As this represented a "novel" question, she "consulted with counsel at the Office of the Attorney General" and "thereby determined that it would not be appropriate under § 682 for non-party presidential candidates to gather signatures at the presidential primary because non-party presidential candidates are seeking the same office as the candidates on the ballot that day." *Id.* ¶ 12. Further, Deputy Secretary Flynn declared that "[t]he Elections Division provided this interpretation to Bangor on February 12, 2024 [and] . . . followed up with a memo to all clerks containing this guidance on February 23, 2024." *Id.* ¶ 14.

petitions to collect petition signatures at their primary polling locations as in the Secretary's view, it threatened to unduly influence the voters.[7]  *Id.* ¶¶ 6, 38.

On March 5, 2024, Maine will hold a presidential primary for the November 2024 presidential general election.  *Secretary of State's Opp'n to Mot. for Prelim. Inj.*, Attach. 1, *Decl. of Julie L. Flynn, Dep. Secretary of State* ¶ 5 (ECF No. 16) (*Flynn Decl.*).  On June 11, 2024, Maine will hold its state primary election for other offices, including the United States Senate, United States House of Representatives, and the entire Maine Legislature.  *Id.* ¶¶ 15, 16.

On February 21, 2024, Team Kennedy filed a complaint against Shenna Bellows in her official capacity as the Maine Secretary of State.  *Compl.* (ECF No. 1).  On February 27, 2024, Team Kennedy amended its complaint, *First Am. Compl.* (ECF No. 8), filed an emergency motion for preliminary injunction, *Em. Mot. for Prelim. Inj.* (ECF No. 9), and submitted a brief in support of its motion.  *Br.* (ECF No. 10) (*Pl.'s Br.*).  That same day, the Court held a telephone conference of counsel.  *Min. Entry* (ECF No. 11).  Two days later, on February 29, 2024, Shenna Bellows responded in opposition.  *Secretary of State's Opp'n to Mot. for Prelim. Inj.* (ECF No. 16) (*Def.'s Opp'n*).

---

[7]     Amended Complaint ¶ 6 reads:  On or about February 12, 2024, town clerks were suddenly informed by the Secretary of State that town clerks were not to allow those with presidential nomination petitions to collect petition signatures at their primary polling locations *as it somehow* threatened (without explanation, as to how) to unduly influence voters."  *Id.* (emphasis supplied).  The inclusion of "as it somehow" seems more editorial than fact and the Court amended the allegation to posit the underlying fact, not the Plaintiff's opinion.

II.    **THE PARTIES' POSITIONS**

    A.    **Team Kennedy's Motion for Emergency Preliminary
           Injunction**

Team Kennedy seeks an "emergency preliminary injunction" to enjoin Maine
Secretary of State Shenna Bellows from 1) enforcing a ban "on independent and third-
party presidential candidates from collecting ballot access petition signatures for
their slates of presidential electors inside polling locations during the . . . 2024
presidential primary election set for March 5, 2024," and 2) enforcing "[t]he voter
registration requirement imposed on presidential electors under Section 352 of the
Maine Election Code." *Em. Mot. for Prelim. Inj.* at 1.

Team Kennedy asserts that the "Equal Protection Clause prohibits [Secretary
Bellows] from denying [] independent and third-party candidates the same electoral
opportunities provided to major political party presidential candidates." *Pl.'s Br.* at
2.    Team Kennedy contends Secretary Bellows "seeks to impose a tortured
application" of 21-A M.R.S. § 682, "in direct violation of [the] authority granted to her
under the Statute." *Id.*

Team Kennedy also claims that "the presidential elector Qualification Clause
of Article II, Section 1, Clause 2, provides the exclusive requirement for a citizen to
serve as a presidential elector [and t]he States have no authority to add to the various
qualification clauses of the United States Constitution." *Id.* Team Kennedy concedes
that states "have plenary authority to establish the mechanisms or means for the
selection of presidential electors" but argues "that authority does not extend to
impose additional requirements to disqualify otherwise qualified citizens from

7

serving as a presidential elector." *Id.* at 2-3.  Moreover, it argues, the right not to register to vote is "a form of political speech protected under the First Amendment." *Id.* at 3.  Therefore, Team Kennedy asserts, "the voter registration requirement violates both the exclusive qualifications set forth under Article II, Section 1, Clause 2 and the First Amendment to the United States Constitution." *Id.*

As far as likelihood of success on the merits, Team Kennedy argues "[t]his case is embarrassingly simple," *id.* at 9, since Secretary Bellows allowed major party presidential candidates to collect ballot access petition signatures inside polling locations during the 2023 general election but now "has interpreted that same right will be denied to independent and third-party presidential candidates." *Id.*  Team Kennedy also contends the "requirement that presidential electors be registered voters is a clear violation," *id.*, as courts "have uniformly held that the States may not add to the exclusive list of qualifications set forth in the text of the Constitution," *id.* at 10, and the "First Amendment right not to register to vote, on its own force, renders the voter registration requirement of [21-A M.R.S. § 352] unconstitutional." *Id.* at 12.

Turning to irreparable harm, Team Kennedy argues the "ban on collecting ballot access petition signatures inside polling locations during Maine's 2024 presidential primary election imposes a deprivation of First Amendment rights which cannot be recovered in the absence of the requested injunctive relief." *Id.*  This is so, it argues, because permission to post petition circulators "inside polling locations for just 1 of 2 primary elections diminishes [Team Kennedy's] opportunity by 50%." *Id.*

at 13.  Further, Team Kennedy adds, "[t]he certainty of a slate of the most trusted presidential electors will be lost in the absence of the required injunctive relief."  *Id.* at 14.

As far as the balance of the equities, Team Kennedy says that the "requested injunction will cause no harm to any cognizable state interest, while . . . [Team Kennedy] is certain to absorb significant injury to important constitutional rights." *Id.*  To buttress this position, Team Kennedy argues "it seems beyond legitimate analysis" that collecting signatures for a slate of independent presidential electors for the general election "can in any way cause voter confusion as to the selection of their own major party candidates seeking their party's presidential nomination" since neither the independent presidential electors nor the candidates the electors intend to support are on the primary ballot.  *Id.* at 15.  Team Kennedy also contends enjoining the voter registration requirement will not "harm any recognized state interest." *Id.*

Concerning the public interest, Team Kennedy asserts that "[s]ecuring signatures for ballot access for a future election has no bearing on the purpose of electioneering protections at the polls," namely "sanitiz[ing] the immediate area of the polling place from the continued din of the just completed election campaign." *Id.*

### B.    Secretary Shenna Bellows' Opposition

Secretary Bellows contends the Court should deny the motion because "all of the Campaign's claims lack merit, and because the other factors for injunctive relief favor the Secretary." *Def.'s Opp'n* at 2.

Concerning Team Kennedy's Equal Protection Clause claim, Secretary Bellows argues that it:

> [I]s predicated entirely upon a fiction: that party presidential campaigns were given a chance to collect signatures at a statewide election, but the Secretary's guidance prevents Mr. Kennedy from receiving the same treatment. In fact, there are *two* statewide elections during the Campaign's signature-gathering window. Because presidential candidates are not on the ballot for the second of these—the June 11, 2024 state primary—the Campaign remains free to gather signatures at that election. Since party presidential candidates also had exactly one statewide election at which to gather signatures, the November 2023 referendum election, the Secretary's guidance results in exactly equal treatment between the two types of candidates.

*Id.* (emphasis in original). Secretary Bellows adds that "Maine's semi-open primary law—allowing unenrolled voters to vote in party primaries, see 21-A M.R.S. § 341— means that the Campaign will have access to the same broad cross-section of voters [during the June 11, 2024 state primary] as the party presidential candidates had in the November 2023 election." *Id.* at 9. Further, Secretary Bellows contends that "the guidance furthers not just legitimate, but vital governmental interests in protecting voters from influence as they carry out their civic duty to vote." *Id.* at 10-11 (citing *Minn. Voters All. V. Mansky*, 585 U.S. 1, 15 (2018); *Burnson v. Freeman*, 504 U.S. 191, 207 (1992) (plurality opinion)). Specifically, Secretary Bellows argues that her "guidance furthers this interest by ensuring that presidential primary voters will not be approached by representatives of a candidate who is seeking the same office as the candidates on the ballot that day and is thus, by definition, an adversary of those candidates." *Id.* at 11.

Secretary Bellows adds that "[t]he Campaign's two remaining legal claims are also meritless." *Id.* at 2.

She contends that Team Kennedy's assertion—that Maine's law requiring presidential electors to be registered voters is unconstitutional—"directly conflicts with a 2020 Supreme Court decision in which Justice Kagan observed . . . that '[a] State can require . . . that an elector live in the State or *qualify as a regular voter*.'" *Id.* (emphasis in Secretary Bellows' opposition) (quoting *Chiafalo v. Washington*, 140 S. Ct. 2316, 2324 (2020)).

Secretary Bellows also contends the text of the Electors Clause makes the flaw in Team Kennedy's theory obvious as it clearly allows the appointment of electors to be made in such manner as the state's legislature may direct. *Id.* at 13 (citing U.S. Const. art. II, § 1, cl. 2).

Secretary Bellows characterizes Team Kennedy's First Amendment claim as a "backup theory that the registration requirement violates the First Amendment rights of Mr. Kennedy's unidentified potential elector, who may not want to register to vote." By her estimation, this argument "fares no better." *Id.* at 15. Secretary Bellows makes three points to support this position. "First, if it is permissible for a state to instruct an elector how to vote, as *Chiafalo* teaches, it cannot violate the Constitution to simply require that same elector to be a registered voter. The former is a far greater intrusion on expressive conduct than the latter." *Id.* "Second, the Campaign cannot rely on *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999), . . . here, in contrast, the issue is not the rights of ordinary

citizens but the criteria under which a person may be appointed to an office of considerable public trust in which they are responsible for carrying out the will of hundreds of thousands of Maine voters at the Electoral College." *Id.* "Finally," Secretary Bellows contends that "even if the registration requirement could be subjected to a standard First Amendment analysis, in which the governmental interests are balanced against burden on candidates or voters, a registration requirement would easily pass muster" because Maine has a "compelling interest in ensuring that electors are part of its political community, and further, meet certain basic standards." *Id.* at 16.

Secretary Bellows also contends that "the Campaign's final claim, which asks the Court to require the Secretary to conform her conduct to the Campaign's (incorrect) interpretation of Maine law, is squarely barred by sovereign immunity." *Id.* at 2 (parenthetical in original).

As far as irreparable injury, Secretary Bellows argues that "[t]he only way the Campaign could suffer injury as a result of the Secretary's guidance is if the guidance would cause it to miss the 4,000-signature threshold and thereby fail to qualify for the ballot [but t]he Campaign does not submit any evidence suggesting that it is likely to miss the signature threshold . . . unless it can gather signatures at polling places in March." *Id.* at 19. She adds that "because there will be a second statewide election in June at which the Campaign will be permitted to gather signatures, its various protestations about the efficiencies of signature gathering at a polling place ring hollow." *Id..* Secretary Bellows also says "[t]here is no First Amendment claim here"

since Team Kennedy "is not alleging that the Secretary is violating an alleged right to speak to voters at the polls, it is alleging that she is not giving the Campaign an equal opportunity to qualify Mr. Kennedy for the ballot." *Id.*.

Turning to the balance of hardships and the public interest, Secretary Bellows asserts the factors "merge when the government is the party opposing a preliminary injunction," *id.* (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)), and "strongly favor the Secretary." *Id.* at 20. This is so, she says, because "[t]he public's interest in attending the polls on election day is in voting for the candidates and issues of their choice. It is not in being solicited to support candidates, sign petitions, or otherwise be subjected to political messages, particularly where those messages are directly relevant to the choices on the ballot that day." *Id.*

## III.   LEGAL STANDARD

Preliminary injunctions are "issued to protect plaintiff from irreparable injury and to preserve the court's power to render a meaningful decision after a trial on the merits." 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2947, at 121 (2d ed. 1995).

"[Injunctive relief] is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012) (quoting *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011)). Instead, a judge should use the authority to grant such injunctive relief "sparingly." *Mass. Coal. of Citizens with Disabilities v. Civil Def. Agency & Office of Emergency Preparedness*, 649 F.2d 71, 76 n.7 (1st Cir. 1981).

The standard for issuing a preliminary injunction is provided by traditional equity doctrines. *Aftermarket Auto Parts All., Inc. v. Bumper2Bumper, Inc.*, No. 1:12-cv-00258-NT, 2012 U.S. Dist. LEXIS 143685, at *3 (D. Me. Oct. 4, 2012); 11A WRIGHT, MILLER & KANE § 2942, at 37.  To determine whether to issue a preliminary injunction a court analyzes four factors:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

*Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 17-18 (1st Cir. 2006) (alteration in original) (quoting *Bl(a)ck Tea Soc'y v. City of Bos.*, 378 F.3d 8, 11 (1st Cir. 2004)).

"The party seeking [an injunction] bears the burden of establishing that these four factors weigh in its favor." *Id.* at 18.  Ultimately, "trial courts have wide discretion in making judgments regarding the appropriateness of such relief." *Francisco Sánchez v. Esso Standard Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2009); *accord Arbojet, Inc. v. Rainbow Treecare Sci. Advancements*, 749 F. 3d 168, 171 (1st Cir. 2015).

Ultimately, "[t]he sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc., v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002); *see also Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 7 (1st Cir. 2012)

14

(confirming that this factor is "the most important part of the preliminary injunction assessment" (quoting *Jean v. Mass. State Police*, 492 F.3d 24, 27 (1st Cir. 2007))).

## IV.   DISCUSSION

The Court first notes the expedited timeline of this matter.  After being notified that it would not be able to collect petition signatures for its presidential electors at primary polling locations on February 12, 2024, Team Kennedy filed a complaint against Secretary Bellows on February 21, 2024.  Team Kennedy filed its motion for injunctive relief and a brief in support of that motion on February 27, 2024, and the narrow window before the March 5, 2024 presidential primary necessitated that Secretary Bellows submit her response two days later on February 29, 2024, and that the Court issue this Order four days—with an intervening weekend—after that.[8]

With that preamble, and before turning to the merits of Team Kennedy's motion, the Court addresses a jurisdictional issue.

### A.   Whether the Secretary's Guidance Correctly Interprets Maine's Anti-Influence Statute (21-A M.R.S. § 682)

#### 1.   Parties' Positions

Team Kennedy's third count is a pendent law claim wherein it argues that 21-A M.R.S. § 682 "does not prohibit independent and third-party presidential candidates from collecting ballot access petition signatures inside polling locations during [a presidential primary election] because the office of presidential elector is not on the primary election ballot" and neither are any of the "presidential electors

---

[8]      In ruling on the motion as quickly as possible, the Court has done its level best, but the parties should appreciate "the temporal constraints under which the district court labored."  *See Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 15 (1st Cir. 2004).

or named presidential and vice-presidential candidates seeking ballot access." *Am. Compl.* ¶ 71.   Therefore, Team Kennedy claims Secretary Bellows' ban on independent and third-party presidential candidates "is in violation of the Statute." *Id.* ¶ 72.   Given Secretary Bellows' "tortured application" of 21-A M.R.S. § 682, *Pl.'s Br.* at 2, Team Kennedy requests that the Court enjoin Secretary Bellows from enforcing her interpretation.

In response, Secretary Bellows challenges whether the Court has jurisdiction and argues that "[t]he Eleventh Amendment to the United States Constitution prohibits citizens from suing a state in federal court unless either the state has expressly consented to such suit or Congress has explicitly and constitutionally abrogated the state's immunity."  *Def.'s Opp'n* at 16 (quoting *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54-58 (1996)).  She adds that "Maine scrupulously guards its Eleventh Amendment sovereign rights" and none of the narrow band of claims for which it has relinquished its sovereign immunity apply here.  *Id.* at 16-17 (citing 14 M.R.S. §§ 8103, 8104-A, 8104-B, 8118).

### 2.    Legal Standard

In its entirety, the Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. CONST. amend. XI.

Long ago, in *Hans v. Louisiana*, 134 U.S. 1 (1890), the Supreme Court "determined that federal jurisdiction over suits against unconsenting States 'was not

16

contemplated by the Constitution when establishing the judicial power of the United States.'  In short, the principle of sovereign immunity is a constitutional limitation on the federal judicial power established in Art. III."  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (internal citations omitted) (quoting *Hans*, 134 U.S. at 1);  *see also Alden v. Maine*, 527 U.S. 706, 728-29 (1999) ("The Eleventh Amendment confirmed, rather than established sovereign immunity as a constitutional principle; it follows that the scope of the States' immunity from suit is demarcated not only by the text of the Amendment alone but by fundamental postulates implicit in constitutional design").  The Supreme Court's "decisions [] establish that 'an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another state.'"  *Id.* at 100 (quoting *Employees v. Missouri Public Health Dep't*, 411 U.S. 279, 280 (1973)).  "This jurisdictional bar applies regardless of the nature of the relief sought."  *Id.*

Given the "vital role of the doctrine of sovereign immunity in our federal system," the Supreme Court has "required an unequivocal expression of congressional intent to 'overturn the constitutionally guaranteed immunity of the several States.'"  *Id.* at 99 (quoting *Quern v. Jordan*, 440 U.S. 332, 342 (1979)).  Otherwise, "a State may at its pleasure waive its sovereign immunity by consenting to suit."  *Coll. Savs. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999).

The state of Maine is not named in the complaint; Secretary Bellows is sued in her official capacity.  However, "[t]he general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against

the latter." *Id.* at 101 (quoting *Hawaii v. Gordon*, 373 U.S. 57, 58 (1963) (per curiam)); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978) (official capacity suits are "another way of pleading an action against an entity of which an officer is an agent").

"The doctrine of *Ex parte Young,* which ensures that state officials do not employ the Eleventh Amendment as a means of avoiding compliance with federal law, is regarded as carving out a necessary exception to Eleventh Amendment immunity." *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) (discussing *Ex parte Young*, 209 U.S. 123 (1908)).   But this "exception is narrow." *Id.* (citing *Green v. Mansour*, 474 U.S. 64, 73 (1985); *Cory v. White*, 457 U.S. 85, 90-91 (1982)).

"The theory of [*Ex parte Young*] was that an unconstitutional enactment is 'void' and therefore does not 'impart to [the officer] any immunity from responsibility to the supreme authority of the United States.'  Since the State could not authorize the action, the officer was 'stripped of his official or representative character and [was] subjected to the consequences of his official conduct.'" *Pennhurst*, 465 U.S. at 102 (second and third alterations in original) (quoting *Ex parte Young*, 209 U.S. at 160).

Following the reasoning in *Ex parte Young*, the Supreme Court, in *Edelman v. Jordan*, 415 U.S. 651 (1974), held "that when a plaintiff sues a state official alleging a violation of federal law, the federal court may award an injunction that governs the official's future conduct . . .." *Pennhurst*, 465 U.S. at 103.  This doctrine is what has

18

allowed Team Kennedy to challenge Secretary Bellows' guidance and the Maine election statute that the guidance interprets on *federal* constitutional grounds.

In *Pennhurst*, the Supreme Court was faced with "the question whether a federal court may award injunctive relief against state officials on the basis of state law." 465 U.S. at 91. It answered no. The *Pennhurst* court wrote:

> A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment. We conclude that *Young* and *Edelman* are inapplicable in a suit against state officials on the basis of state law.

*Id.* at 106. The Supreme Court continued, "*Larson* thus made clear that, at least insofar as injunctive relief is sought, an error of law by state officers acting in their official capacities will not suffice to override the sovereign immunity of the State where the relief effectively is against it." *Pennhurst*, 465 U.S. at 113 (citing *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 690, 695 (1949)).

### 3.    Application

*Larson* and *Pennhurst* thus make it clear that Secretary Bellows, in her official capacity, as well as the state of Maine, insofar as Team Kennedy is suing for injunctive relief because of a misapplication of state law, have sovereign immunity; they therefore cannot be sued absent the State consenting to suit or Congress unequivocally expressing their congressional intent to overturn the State's immunity.

19

14 M.R.S. § 8818 states "[n]othing in this chapter or any other provision of state law shall be construed to waive the rights and protections of the State under the Eleventh Amendment to the United States Constitution, except where such waiver is explicitly stated by law . . .." *Id.* Team Kennedy does "not direct us to any law to the contrary, nor do[es it] argue that the [State] has waived its immunity by any other means . . .." *Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13, 34 (1st Cir. 2006). Team Kennedy has also not provided any evidence of an unequivocal congressional intent to overturn the State's immunity. Accordingly, the Court concludes this claim is barred by state sovereign immunity and the Court therefore lacks jurisdiction to enjoin Secretary Bellows acting in her official capacity based on an alleged misinterpretation of *state* law.

At the same time, it is "well-established under First Circuit precedent that federal courts may resolve a case on the merits in favor of a state without first resolving any Eleventh Amendment issues the state raises." *Borrás-Borrero v. Corp. del Fondo del Seguro del Estado*, 958 F.3d 26, 33 (1st Cir. 2020) (quoting *Brait Builders Corp. v. Mass., Div. of Cap. Asset Mgmt.*, 644 F.3d 5, 11 (1st Cir. 2011)). "As a result, [a federal court] may 'defer thorny Eleventh Amendment questions in cases in which it is perfectly clear that the state entity will prevail on the merits.'" *Id.* (quoting *Dávila v. Corp. de P.R. para la Difusión Pública*, 498 F.3d 9, 14 (1st Cir. 2007)); *see also Parella v. Ret. Bd. of the R.I. Emps. Ret. Sys.,* 173 F.3d 46, 53–57 (1st Cir. 1999) (courts may bypass jurisdictional inquiries involving the denial of an Eleventh Amendment defense where the merits of the underlying issue are easily

20

resolved).  While the Court has engaged in the jurisdictional inquiry, it also concludes the underlying merits are "perfectly clear."  *Borrás-Borrero*, 958 F.3d at 33.

Team Kennedy's argument that Secretary Bellows is misinterpreting 21-A M.R.S. § 682 boils down to a claim that because "none of the presidential electors or the named . . . candidates seeking ballot access are on the March 5, 2024 primary election ballot," *Am. Compl.* ¶ 71, Secretary Bellows is "seeking to ban the collection of ballot access petition signatures for candidates [and] . . . an office [] not on the primary election day ballot in direct violation of authority granted to her under the Statute."  *Pl.'s Br.* at 2.  Team Kennedy's position is that "it seems beyond legitimate analysis" that collecting signatures for a slate of independent presidential electors for the general election "can in any way cause voter confusion as to the selection of their own major party candidates seeking their party's presidential nomination" since neither the independent presidential electors nor the candidates they intend to support are on the primary ballot.  *Id.* at 15.  Secretary Bellows characterizes this argument as "hair-splitting."  *Def.'s Opp'n* at 11 n.3.

The Court concludes Team Kennedy's argument is flawed.  Independent or third-party candidates collecting signatures for their ballot access petition during the presidential primary might not lead to voter confusion but that is not the standard the Maine Legislature drafted and passed; the measuring stick here is influence.

21-A M.R.S. § 682(2) states that "within the voting place itself, a person *may not: A. influence* another person's decision regarding a candidate for an office or question that is on the ballot for the election that day; *or B. Attempt to influence*

another person's decision regarding a candidate for an office or question that is on the ballot for the election that day." *Id.* (emphasis supplied).

The candidates on the March 5, 2024 presidential primary ballots in Maine are Ryan L. Blinkley, Ron DeSantis, Nikki R. Haley, Vivek G. Ramaswamy, Donald J. Trump, Joseph R. Biden, Jr., and Dean B. Phillips. *Upcoming Elections*, MAINE.GOV, https://www.maine.gov/sos/cec/elec/upcoming/index.html (linking to the four sample ballots for the March 5, 2024 presidential primary). Each of these individuals seeks the office of President of the United States and each is "a candidate for an office . . . on the ballot for the election that day." 21-A M.R.S. § 682(2)(A). Here, Team Kennedy proposes that a presidential candidate, who is also seeking the office of President of the United States, may campaign inside the voting place as voters consider casting a vote for other presidential candidates, and yet not (or attempt to) influence voters' decisions about the presidential election.

The statute does not limit the prohibition to a candidate or his staff influencing another's decision regarding themselves. The statute does not say that a candidate is only barred from specifically influencing people to vote for them or against another candidate. The statutory language is far broader. *See* 21-A M.R.S. § 682(2) ("a person may not: A. influence . . . or B. Attempt to influence another person's decision regarding a candidate . . . that is on the ballot for the election that day").

As Secretary Bellows points out, "[g]iven the zero-sum nature of politics, even a purely positive appeal to voters that does not mention the other candidates on the ballot sends an unavoidable message that the voter should support Mr. Kennedy for

president, and therefore not any of the candidates on the ballot that day." *Def.'s Opp'n* at 11. If Team Kennedy is successful in convincing voters on March 5, 2024 to sign Mr. Kennedy's ballot access petition, the perceived landscape of the electoral field would also change, thereby necessarily influencing "another person's decision regarding a candidate for an office . . . on the ballot for the election that day." 21-A M.R.S. § 682(2)(A).

The requirement that Team Kennedy, and all other independent and third-party presidential candidate campaigns, collect signatures during the June 11, 2024 statewide election for United States Senators, Representatives to the United States House of Representatives, and all Maine legislators—none in direct competition for votes for the presidency—seems a commonsensical, not tortured, reading of a statute trying to limit influence on voters. As does reading the statute to require that non-presidential candidates (i.e., those running for the state and federal legislatures) gather their signatures during the March 2024 presidential primary election, as there is no direct competition there—an interpretation of the statute also followed by Secretary Bellows.

In other words, even accepting as true that Team Kennedy's proposition that ballot access petitions are solely for the election of a presidential elector, it still follows that the gathering of signatures, for the presidential electors of someone running for president, at a primary where voters are voting for other presidential candidates, will influence, or attempt to influence, voters' decisions regarding presidential candidates on the ballot on that day. Therefore, the Court concludes that it is within the State

and the Secretary's statutory purview to curtail influencing voters about presidential electors at the presidential primary polls.

"The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc., v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002). As Team Kennedy's pendent state law claim falters at this first step, the Court does not engage in "idle curiosity" as to the remaining factors. *Id.*

### B. Whether the Requirement that Presidential Electors be Registered Voters Violates the Electors Clause and the Potential Electors' First Amendment Rights

The crux of Team Kennedy's Electors Clause argument is that "[t]he State of Maine, and [Secretary Bellows], has no authority to enforce additional qualifications for presidential electors by requiring them to be registered voters." *Pl.'s Mot.* at 10. Team Kennedy alleges that this voter registration requirement "prevents [it] from selecting one of its preferred candidates to serve as a presidential elector for Mr. Kennedy." *Id.*

Secretary Bellows disagrees and argues that:

The flaw in the Campaign's Electors Clause theory is apparent from the text itself: the appointment of electors is to be made "in such manner as the Legislature [of each state] may direct." Maine's Legislature has chosen to condition being an elector on registering to vote—thereby ensuring that the elector is part of Maine's political community and meets certain basic standards, specifically, being a U.S. citizen, Maine resident, and at least 18 years of age. *See* 21-A M.R.S.A. § 111 (setting forth eligibility requirements to vote). By so doing, Maine is determining the "manner" by which its electors are appointed to the Electoral College, just as the Electors Clause allows.

*Def.'s Opp'n* at 13.

Although Team Kennedy briefed this issue, during the February 27, 2024 conference of counsel, Team Kennedy indicated that it does not see a need for the Court to address this issue at the preliminary injunction stage because the Court could later issue relief permitting the campaign to substitute its current electors. Secretary Bellows disagrees; she argues that the "problem with the deferred relief suggested by the Plaintiffs is that, were such relief granted, unknown numbers of voters would have already signed petitions containing an inaccurate list of elector candidates," *Def.'s Opp'n* at 12 n.4, and some voters may care about the identities of their proposed electors. *Id.* Secretary Bellows further argues that "the Legislature has deemed the information important enough to be printed on the face of the petition form." *Id.* (citing 21-A M.R.S. § 354(1)(B)). Therefore, "to ensure that as many voters as possible are presented with accurate information on the Campaign's petition forms, the Secretary urges the Court to consider the Campaign's likelihood of success on this issue now." *Id.*

However, as Secretary Bellows indicated in the conference of counsel and intimated in her response, these issues only needed to be decided at this preliminary injunction stage if the Court were to grant the preliminary injunction and Team Kennedy would be collecting signatures tomorrow with an open question as to the eligibility of its electors. As the Court is not granting the injunction, as discussed below, the issue of unknown numbers of voters signing petitions containing an inaccurate list of electors is not pressing. June 11, 2024 is the next election date in

25

Maine, and Secretary Bellows has indicated she will not object to Team Kennedy's use of polling locations on June 11, 2024 to collect ballot access petition signatures. As this is months away, and the parties agree this issue is not urgent under these circumstances, the Court defers ruling on Count II at this expedited preliminary injunction stage and waits until there is further briefing.[9]

### C. Whether Secretary Bellows' Application of the Maine Anti-Influence Statute Violates Team Kennedy's Equal Protection Rights under the Fourteenth Amendment[10]

#### 1. Legal Standard

As the United States Supreme Court has written, "it is [] clear that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). At the same time, the "First Amendment protects the right of citizens to associate and to form political parties for the advancement of common political goals and ideas," so "political parties' government, structure, and activities enjoy constitutional protection." *Id.*

---

[9]    In footnote 5 of the Secretary's opposition, she raises a standing issue concerning the Electors. *Def.'s Opp'n* at 15, n.5. In her footnote, she acknowledges that the Court may not need to consider the standing issue in this highly expedited preliminary proceeding. *Id.* If Secretary Bellows wishes to revisit this issue in the future, she may do so.

[10]   Secretary Bellows says "[i]t is less than clear that the manner by which the State provides opportunities for signature gathering at the polls is a "ballot access regulation" subject to the sliding scale test . . .. The Secretary assumes that it is for purposes of these highly expedited preliminary proceedings but reserves the right to argue at a later time that rational-basis review should apply." *Def.'s Opp'n* at 8 n.2. Team Kennedy's complaint and motion do not take a position on this matter.

The Court does not reach this question as it is clear that this is a state election law challenge and the same sliding scale analysis courts apply to ballot access restrictions, a subset of state election laws, applies regardless. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

In challenging a state election law under the Constitution, a "mere demonstration that a state provision distinguishes among groups (such as candidates affiliated with a recognized political party and those not so aligned) is insufficient by itself to establish an equal protection violation. Rather, a claim of unconstitutionality must be grounded in a showing of substantial discrimination." *Galvin*, 626 F.3d at 109; *accord id.* ("'Statutes create many classifications which do not deny equal protection; it is only "invidious discrimination" which offends the Constitution'" (quoting *Am. Party of Tex. v. White*, 415 U.S. 767, 781 (1974) (quoting *Ferguson v. Skrupa*, 372 U.S. 726, 732 (1963)); and citing *Clements v. Fashing*, 457 U.S. 957, 967 (1982)))). In balancing these competing interests, "the Supreme Court has developed a flexible 'sliding scale' approach for assessing the constitutionality of such restrictions." *Galvin*, 626 F.3d at 109 (citing *Timmons*, 520 U.S. at 358; *Burdick v. Takushi*, 504 U.S. 428, 432–34 (1992).

Under this sliding scale, "[a] court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 213-14 (1986)); *accord Galvin*, 626 F.3d at 109 (citing *Timmons*, 520 U.S. at 358; *Burdick*, 504 U.S. at 432-34; *Werme v. Merrill*, 84 F.3d

479, 483 (1st Cir. 1996)).  "[W]hen the burden imposed . . . is heavy, the provision must be narrowly tailored to promote a compelling state interest.  Reasonable, nondiscriminatory restrictions, however, need be justified only by legitimate regulatory interests."  *Galvin*, 626 F.3d at 109 (internal citation omitted) (citing *Timmons*, 520 U.S. at 358).  Ultimately, "equality of opportunity—not equality of outcomes—is the linchpin of what the Constitution requires in this type of situation." *Werme*, 84 F.3d at 485.

### 2.    Application

Team Kennedy asserts that the guidance Secretary Bellows promulgated barring non-party presidential candidates from collecting signatures at voting places during the March 5, 2024 presidential primary violates its Fourteenth Amendment right to equal protection because it is unequal treatment since the party presidential candidates were allowed to collect signatures at voting places during the November 2023 general election.  Team Kennedy relies on *Anderson v. Firestone*, 49 F. Supp. 1027 (N.D. Fla. 1980) for the proposition that "denial of equal protection is shown upon a state's 'failure to provide the same or similar mechanisms . . . as provided to party candidates.'"  *Pl.'s Br.* at 8 (quoting *Anderson*, 49 F. Supp. at 1029).  By Team Kennedy's estimation, this case is analogous and clearly in violation of the Equal Protection Clause.  In its amended complaint, Team Kennedy further outlines its injury:  it must collect a minimum of 4,000 valid signatures from registered voters on its non-party nomination petition but may submit no more than 5,000 collected raw signatures.  *Am. Compl.* ¶¶ 27, 30.  This onerous task, Team Kennedy explains, is

simplified by trying to get valid signatures at polling locations on election day.  Team

Kennedy indicates that:

> In addition to the benefit of knowing that election day signers at polling
> locations are registered voters, thereby making the screening process
> quicker, professional petition circulators (because of the high validity
> rate of signatures collected at polling locations) charge roughly 50% of
> the normal per-signature rate – a savings to Plaintiff of approximately
> $22,500.00 (in order to file the maximum permitted number of 5,000
> signatures, selected based on internal validation analysis, Plaintiff must
> collect about 7,5000 raw signatures at about $7.00 per signature—a
> slightly less than a 50% reduction to $4.00 per signature on 7,500 raw
> signatures equates to a savings to Plaintiff of approximately
> $22,5000.00).

*Am. Compl.* ¶ 39.

Secretary Bellows retorts that the "factual lynchpin of this theory" is that the

March 5, 2024 presidential primary is the only election at which Team Kennedy is

lawfully permitted to collect ballot access petition signatures from registered voters.

*Def.'s Opp'n* at 9.  However, Secretary Bellows argues that "allegation is dead wrong"

as there are "two statewide elections that will take place during the Campaign's

signature-gathering window."  *Id.*  This second statewide election, the Maine state

primary, will occur on June 11, 2024, and the "Campaign will be permitted to gather

signatures."  *Id.*  Moreover, Secretary Bellows avers Team Kennedy "will have access

to the same broad cross-section of voters as the party presidential candidates had in

the November 2023 election."  *Id.*  Secretary Bellows continues, "[t]hus, far from

creating unequal treatment, the Secretary's guidance has the effect of giving every

candidate running for office in Maine in 2024 exactly the same treatment."  *Id.*  In

particular, Secretary Bellow claims that:

> Every type of candidate gets one—and only one—opportunity to collect signatures at the polls. Party presidential candidates got to collect signatures at the November 2023 referendum election before turning in their signatures by November 20, 2023; non-party presidential candidates get to collect signatures at the June 2024 state primary election before turning in their signatures by July 25, 2024; and all other candidates, party and non-party, get to collect signatures at the March 2024 presidential primary before turning in their signatures by March 15 and May 25 respectively.

*Id.* at 9-10.

Team Kennedy's main claim of unequal protection, namely that its campaign has fewer opportunities than parties to collect ballot access petitions at voting locations from registered voters, runs aground on the facts. *See Am. Comp.* ¶ 34. On June 11, 2024, Team Kennedy, a non-party presidential campaign, is getting its one opportunity to collect ballot access petition signatures at polling locations. Similarly, party presidential candidates got to collect ballot access petition signatures at polling locations once. Non-presidential candidates, whether party or non-party, also get to collect ballot access petition signatures at polling locations once. If all potential candidates, regardless of what office they seek or whether they are aligned with a party, get one shot at collecting ballot access petition signatures at polling locations, "equality of opportunity . . . what the Constitution requires in this type of situation," exists. *Werme*, 84 F.3d at 485.

Insofar as Team Kennedy's alleged injury is financial because it will be charged more by professional petition circulators if it is not allowed to collect signatures for its ballot-access petition at a polling site on the day of an election, that injury is also

obviated by the fact that Team Kennedy *will* be able to collect signatures at the polls on an election day—the June 11, 2024 state primary—albeit a different day.[11]

While underdeveloped, Team Kennedy claims an injury insofar as it is only being given the opportunity to collect signatures one time during its signature-gathering window, on June 11, 2024, instead of being allowed to do so twice, once on March 5, 2024, and then on June 11, 2024. *See Pl.'s Br.* at 14 ("Permission to post circulators inside polling locations for just 1 of 2 primary elections diminishes Plaintiff's opportunity by 50%").

Although the Court acknowledges that it would be easier for Team Kennedy to collect the required signatures if given two opportunities to do so, instead of just one, that is not the test for an equal protection claim. The Equal Protection Clause requires equality of treatment before the law. If the similarly situated party-affiliated presidential candidates are only allowed one day to collect ballot access signatures, then limiting the non-party-affiliated Team Kennedy campaign to the same is "equality of opportunity" to gather signatures. *Galvin*, 626 F.3d at 110. In other words, insofar as a burden exists, party, non-party, presidential, and non-presidential candidates share that burden. This situation is not the "invidious discrimination" courts find to offend the Constitution. *Id.* at 109. *See Williams v. Rhodes*, 393 U.S. 23, 30-34 (1968); *McClure v. Galvin*, 386 F.3d 36, 42 ("The

---

[11]     Team Kennedy has not alleged that professional petition circulators would charge more at the June 11, 2024 state primary than at the March 5, 2024 presidential primary. Instead, its amended complaint indicates that "professional petition circulators (because of the high validity rate of signatures collected *at polling locations*) charge roughly 50% of the normal per-signature rate . . .." *Am. Compl.* ¶ 39 (emphasis supplied).

significance of the burden on [Plaintiff] is further reduced by the fact that it falls evenly on all political groups . . . The scheme applies evenhandedly to enrolled individuals of all parties . . . The rule thus equally burdens Republicans, Democrats, and independents").

This limited burden on Team Kennedy is weighed against "the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789 (1983); *Tashjian*, 479 U.S. at 213-14).

The precise interest the State puts forward here is "protecting voters from influence as they carry out their civic duty to vote." *Def.'s Opp'n* at 11. Secretary Bellows contends her guidance furthers this governmental interest, which is "not just legitimate, but vital." *Id.* at 10. She adds that the "Supreme Court has recognized the strong state interest in providing voters at the polls with an 'island of calm in which voters can peacefully contemplate their choices,' free of solicitations, campaigns, and other attempts to influence them." *Id.* at 11 (quoting *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1887 (2018); and citing *Burson v. Freeman*, 504 U.S. 191, 207 (1992) (plurality opinion)).

Secretary Bellows also contends this interest makes it necessary to burden Team Kennedy's rights. This guidance, she argues, ensures "presidential primary voters will not be approached by representatives of a candidate who is seeking the same office as the candidates on the ballot that day and is thus, by definition, an

adversary of those candidates." *Id.*  Additionally, Secretary Bellows says that "[g]iven the zero-sum nature of politics, even a purely positive appeal to voters that does not mention the other candidates on the ballot sends an unavoidable message that the voter should support Mr. Kennedy for president, and therefore not any of the candidates on the ballot that day." *Id.*

In *Burson*, the Supreme Court found that a Tennessee law imposing a 100-foot campaign-free zone around polling place entrances withstood even the strict scrutiny applicable to speech restrictions in traditional public forums." 504 U.S. at 211. Therefore, the Supreme Court indicated the campaign-free zone around polling place entrances, and impliedly within the polling place itself, is a compelling governmental interest.  "That analysis emphasized the problems of fraud, voter intimidation, confusion, and general disorder that had plagued polling places in the past." *Mansky*, 585 U.S. 1 at 13 (quoting *Burson*, 504 U.S. at 200-204).  In upholding and extending *Burson*, the *Mansky* court added that "[a]gainst that historical backdrop, the plurality and Justice Scalia upheld Tennessee's determination, supported by overwhelming consensus among the States and 'common sense,' that a campaign-free zone outside the polls was 'necessary' to secure the advantages of the secret ballot and protect the right to vote." *Id.* (citing *Burson*, 504 U.S. at 200, 206-208, 211).  The State has a compelling interest in regulating campaigning at polling places, *see Burson* and *Mansky*, and that interest only increases when the campaigning party is seeking the same office as those on the ballot during that election.

In its analysis of the record, the Court has not found that the burden imposed on Team Kennedy is heavy. But, in fairness to Team Kennedy, the Court will address its contention that Secretary Bellows' guidance amounts to a heavy burden and therefore must be "narrowly tailored to promote a compelling state interest." *Galvin*, 626 F.3d at 109 (internal citation omitted). This is commonly referred to as strict scrutiny. As indicated above, the state interest is compelling. The question then becomes whether this policy is narrowly tailored. The Court concludes it is. Indeed, it is hard to conceive how this policy could be tailored more narrowly.

"[T]he narrow tailoring doctrine does not require perfect tailoring." *Cutting v. City of Portland*, 802 F.3d 79, 86 (1st Cir. 2015). Instead, courts look to see whether a lawful alternative or less restrictive means could have been used. *See Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280 n.6 (1986). Here, the Maine Legislature has enacted a provision that seeks to create the "island of calm" expressly sanctioned by the United States Supreme Court in *Minnesota Voters*. 138 S. Ct. at 1888. As a practical matter, it makes eminently good sense for the law, as interpreted by Secretary Bellows, to restrict candidate solicitations from inside voting locations when the office being sought is on the ballot that day. Limiting access to that particular situation is minimally restrictive. The fact that Maine law, as viewed by the Secretary, does not restrict Team Kennedy or other candidates from proselytizing inside the voting location when the office being sought is not on the ballot only strengthens the Secretary's argument that the Legislature's and her concern is the

protection of the voting public from solicitation near or inside the voting location from candidates on the ballot on the day of the vote.

Here, the state has created a policy that limits all individuals seeking public office to collecting signatures for their ballot access petition in polling places once. This limitation applies to all regardless of party affiliation and office sought.  To do so, the State has created an intricate system to minimize how much it restricts speech.  True, each of these candidates has a different window to collect signatures. It is also true that party presidential candidates and non-party presidential candidates collect signatures on different days than each other and all other candidates.  However, this system is what ensures that voters casting their vote are not influenced by anyone seeking the office that is on the ballot that day or by some representative of the candidate.

Taken together, the low burden imposed on Team Kennedy's ability to obtain ballot signatures weighed against the compelling state interest of protecting voters from influence while they are mere feet away from the ballot box, and how necessary this narrowly tailored system appears to be to achieve equality, it seems very unlikely that Team Kennedy has a likelihood of success on the merits.  *See McClure*, 386 F.3d at 42.

### D.   Irreparable Harm, Balance of Equities, and the Public Interest

"The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity."  *New Comm Wireless*

*Servs., Inc., v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).  As the only remaining claim before the Court, Team Kennedy's equal protection challenge, falters at this first step, the Court does not engage in "idle curiosity" as to the remaining factors. *Id.*

## V.   CONCLUSION

The Court DENIES Team Kennedy's Emergency Motion for Preliminary Injunction (ECF No. 9).


SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 4th day of March, 2024